# Exhibit A

UNITED STATES DISTRICT COURT DISTRICT OF DELEWARE

American General Life Insurance Company

(Plaintiff)

vs

Wilmington Trust, National Association

(Defendant)

Civil Action No. 1:22-cv-01092-GBW

Expert Report of Jim Toole, FSA, CERA, MAAA

December 6, 2024

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................3

II.   SUMMARY OF OPINIONS.............................................................................4

III.  OVERVIEW OF LIFE INSURANCE PRODUCTS AND MARKETS ...........................5

IV.   MISSTATEMENT OF AGE: CONSEQUENCES AND REMEDIES ...............................9

**<u>EXHIBITS</u>**

A.    **JIM TOOLE CURRICULUM VITAE**

B.    **MATERIALS CONSIDERED**

## I.    INTRODUCTION

1.    Aurora Actuarial has been engaged by Maynard Nexen, counsel to American General Life Insurance Company ("American General"), and I, Jim Toole, will serve as expert.

2.    The case involves the maturity benefit of two $5,000,000 UL life insurance policies ("the Policies") issued by American General in 2005 and 2006 to the Mike Magid Irrevocable Trust on the life of Meyer Magid ("the Insured").  The Policies were subsequently assigned to third parties and changed hands among various life settlement companies over the years.  The current owner and beneficiary of the Policies is Wilmington Trust.

3.    This matter concerns a dispute regarding the calculation of death benefits for the Policies subsequent to the identification of a misstatement of age in the original application for insurance. The misstatement was identified after an inconsistency in the insured's birth date was noted in the death certificate.

4.    I have been asked by Counsel to  1) explain life insurance background and concepts relevant to this matter  2) determine the appropriate approach to recalculating death benefits at age 100, given the age misstatement  3) present any other information relevant to the case.

### Experience

5.    I have over 35 years of experience working as an actuary in the life insurance industry.  I have significant experience pricing and modeling insurance products similar to the policies relevant to this litigation, including the appraisal of inforce blocks of business and going concerns.  In these roles, I have performed numerous experience studies for new business and inforce blocks of business and worked closely with teams developing new products, managing inforce blocks, and evaluating strategic options for insurers.  During the normal course of business, I have reviewed and edited hundreds of life insurance contracts, including contracts similar to those at issue in this case.

6.    I am a Fellow of the Society of Actuaries ("SOA") and a member of the American Academy of Actuaries ("The Academy").  I have been awarded the Chartered Enterprise Risk Analyst credential ("CERA"), which recognizes contributions and educational achievement in the field of Enterprise Risk Management.  I have served two terms on the SOA Board of Directors, and have served in many other leadership and volunteer roles for the SOA and The Academy.

7.    I was co-editor and co-author of the textbook "Insurance Industry Mergers and Acquisitions" published by the SOA in the spring of 2005, which is included on the SOA education and examination syllabus.  From 2006 – 2010, I served as lead researcher on SOA projects to analyze the potential impact of a pandemic on the U.S. life and health insurance industries.  From 2012 – 2013, I served on the Syllabus Development Committee for the SOA's General Insurance Track, and from 2015 – 2018, I was a member of the Health Curriculum Committee.

8.    I currently serve as vice chair of the Individual Life Experience Committee ("ILEC") of the SOA, which evaluates recent mortality experience relative to standard industry mortality tables and observes general trends in mortality experience by key policy characteristics.

9.  My curriculum vitae is included as **Exhibit A.**  Among other things, it lists the publications I have authored, and the cases in which I testified as an expert in the last 4 years.

*Compensation*

10.  This report is being issued as of December 6, 2024 and has been solely prepared for purposes of this litigation.  Information contained herein shall not be used or relied upon for any other purpose than the above-referenced litigation.  This report provides my expert professional opinions with respect to this matter as set forth below.

11.  I am compensated at an hourly rate of $600 for my time incurred for performing the work required to prepare this report and to testify as needed.  My compensation does not depend on the opinions I provide or on the outcome of this case.

*Materials Considered*

12.  In arriving at my opinions, I have considered the materials and information listed in **Exhibit B**. I analyzed the materials and data received as I considered necessary.  The body and footnotes of my report identify documents I relied upon by deposition exhibit number, Bates number, or other description of the document.  I have added emphasis to various citations throughout this report to highlight particularly important sections of document passages.

13.  My opinions are based upon the information available to me as of the date of this report.  To the extent that additional information becomes available, my analysis and opinions may be modified or supplemented.

14.  This report contains statements of actuarial opinion under guidance promulgated by the American Academy of Actuaries and the Actuarial Standards Board.  I am a member of the American Academy of Actuaries and meet the qualification standards to render the opinions contained herein.

## II.    SUMMARY OF OPINIONS

*Opinion 1*

15.  Reflecting the appropriate cost of insurance (and mortality risk), the amount of death benefit that can be purchased on the Policies beyond age 100 is zero.

*Opinion 2*

16.  There is no provision in the Policies to allow for the extension of maturity beyond age 100 without the purchase of a Maturity Extension Rider, which the investors chose not to do at various opportunities throughout the life of the policy.  This benefit is valuable and costly. Misstating the issue age is not a free pass to obtain the Maturity Extension Rider.

*Opinion 3*

17.  Under Internal Revenue Code section 7702(e)(1)(B), a life insurance contract's deemed maturity date can be no earlier than the insured's attained age 95 and no later than the insured's attained age 100.  This is generally the termination date set forth in the contract or the end of the mortality

table, in this case 100. This is consistent with the manner in which American General administered the contract when they learned of the insured's misstatement of age.

## III.    OVERVIEW OF LIFE INSURANCE PRODUCTS AND MARKETS

18.    There are three general types of life insurance products: term, whole life, and flexible premium products. All of the products offer life insurance coverage for a defined coverage period. If the insured does not die by the end of the coverage period the policy "matures". Maturity can be thought of as an automatic surrender where the contract terminates and the cash value (if any) is paid out to the policyholder. The maturity date is established by the terms of the contract and can be based on a period of time or an attained age.

19.    The values in an insurance contract are dependent on the true age of the insured: from the premiums, to the amount of insurance coverage, to the cost of insurance, and ultimately the maturity date. This is because the probability of death depends on the insured's attained age, and the risk of death increases substantially as attained age increases. To the extent that the true age of the insured is misstated, all of the policy values are affected. Correct information about the insured's true age is the foundation for accurate insurance calculations which appropriately reflect the risks assumed by the insurer.

### Term Insurance

20.    Term insurance provides pure insurance protection for a limited coverage period (e.g. 10, 20, 30 years). Term life pays the face amount of the policy to the beneficiary if (and only if) death of the insured occurs during the policy term. With term life, there is no cash value during the coverage period or endowment at maturity. Term premiums provide a margin for expenses associated with commissions, underwriting, administrative costs, setting up and holding statutory reserves, in addition to covering the insurance company's mortality risk and providing for a profit.

### Whole Life

21.    Whole life products provide guaranteed coverage to a specified maturity date for a fixed premium. Whole life products provide the additional benefit of guaranteed cash values which are available to the policyholder through policy loans or surrender. Cash values increase by a pre-determined formula to become equal to the face amount, and then endow at the maturity date.

22.    Policy owners pay periodic premiums and may receive dividends from the insurer to reflect the performance of the product versus pricing. Companies that pay dividends are conservative in their pricing assumptions, which typically allows for improvements in the dividend scale over time. Dividends can be distributed to the policy owner in various forms: it can be paid in cash, held on account, used to buy one year term insurance (increasing the face value of the policy), or used to purchase paid up additions (increasing both the face value and cash value of the policy).

### Flexible Premium Products

23. Flexible premium products include Variable and Universal life type products, with or without secondary guarantees. The flexible premium products at issue in this case are Universal Life ("UL") type products.

24. UL products have flexible premiums, adjustable death benefits, and an underlying fund accumulation defined in the contract. These elements provide policyholders with numerous choices and substantial flexibility in the way the products can be used to meet financial planning needs. Similar to a bank account, statements are provided each year which show deposits and withdrawals to the fund, expenses, cost of insurance charges, and interest credited.

25. The key to UL is flexibility, both for the insured and the insurer. The typical Universal Life policy has a planned premium. A planned premium is established at issue but policyholders can pay more or less than that amount as long as there are sufficient funds to keep the policy in force. In addition, the policyholder can make withdrawals or take loans against the cash value.

26. Additional UL contractual options include face amounts that are flexible and can be changed by the owner subject to terms and conditions of the contract. UL products have various riders and options available to adjust policy features to tailor the product to the needs of the owner during the life time of the insured, including the ability to adjust the maturity date.

### Maturity Date

27. Key to the issue at hand is the treatment of the Policies at the maturity date. Maturity date is derived using the attained age of the insured (typically 95 or 100 at the time the Policies in question were written) or a period of time (eg 10, 20 or 30 years).

28. Term products typically mature after a defined period of time. Term products provide only death benefit coverage for the term period; there typically is no cash value at any point during the coverage period or endowment at maturity.

29. Whole life policies typically mature at a specific age. The product is engineered so the cash value of the policy builds over the life of the policy to provide for a guaranteed endowment equal to the face amount at the maturity date.

30. A key contractual difference between Whole Life and UL is what happens at maturity. For Whole Life, maturity includes the payment of the guaranteed endowment to the beneficiary. However, because UL premiums are flexible and charges are not guaranteed, there are no guaranteed cash values and there is *no guaranteed distribution from a UL policy at maturity*. To the extent that there are funds available they are distributed, but unlike Whole Life, there is no guaranteed distribution amount at maturity in a UL policy.

31. This is one of the trade offs between the availability of flexible premiums and non guaranteed charges in Universal Life versus the fixed premium payments required by Whole Life products.

### Tax Treatment of Life Insurance

32. Life insurance policies receive favorable tax treatment under the law. Since the inception of the federal income tax law in 1913, life insurance death benefits have generally not been subject to

income tax[1]. This tax benefit is one of many fundamental reasons for the growth of the life insurance industry.

33. One of the primary purposes of life insurance is to provide financial assistance to beneficiaries at the time of the death of the insured. However, many life insurance products contain provisions for the accumulation of a savings element that is referred to as "cash value" or "fund value". The interest that is earned on life insurance products is referred to as "inside build-up".

34. The IRS promulgates regulations surrounding the standards that life insurance products must meet in order to qualify for preferential tax treatment. In general terms, the tax benefits afforded life insurance products include:

- Tax-free death benefits - The death proceeds of life insurance are generally received income tax free by the beneficiary as opposed to a traditional retirement plan where distributions to a beneficiary following death of the plan participant are typically subject to income taxation.

- Tax-free inside buildup – All income and capital gains generated inside the life insurance policy are excluded from the policy owner's income. This is a feature that is not found in most other investment vehicles.

35. In order to qualify for favorable tax treatment, the products must qualify as life insurance products. The requirements to qualify as life insurance are laid out in Code 7702 and 7702a. Because the consequences of failing to qualify as insurance are so great, insurers generally require that policies automatically meet these standards by enforcing performance and running tests to ensure policies remain compliant.

### Life Settlements & Stranger Owned Life Insurance ("STOLI")

36. The life settlement industry commenced in earnest in the early 2000's. The term "life settlements" generally describes a transaction involving the sale of life insurance policies covering insureds over the age of sixty-five who may not necessarily be suffering from a terminal or chronic illness or condition, but nevertheless have a limited life expectancy.

37. The early time-period of the life settlement industry pejoratively had a "wild west" characterization. Although life settlements were regulated in some states (e.g., Florida), many of the jurisdictions with the largest number of life settlements (e.g., New York, California) did not have any laws regulating life settlement practices.

38. The absence of regulation led to questionable or outright fraudulent business practices, such as circumventing a particular state's life settlement regulations by moving the transaction to an unregulated state via trust transfer that included an individual with some tangential connection to that jurisdiction and Stranger Originated Life Insurance ("STOLI") policies.

39. STOLI transactions involved the insured buying a life insurance policy for the benefit of a third-party investor that had no insurable interest at the inception of the policy. The unrelated third-

---

[1] Desrochers, et al. 2004. *Life Insurance & Modified Endowments Under Internal Revenue Code Sections 7702 and 7702A.* Society of Actuaries, Schaumburg Ill., p. 1.

party investor would typically provide funds to the insured to pay premiums before the policy could be sold in the secondary life settlement market.

40. The growth of the life settlements market's early days was also due to life insurance agents behavior. Some life agents worked hand-in-hand with brokers to manufacture policy inventory in exchange for a share of the commissions, fraudulently originating policies or manipulating policy information to be attractive to life settlement investors.

41. STOLI policies are considered "wasting assets" – the longer they stay in force, the worse the investor's return. This is because the owner must pay premiums to keep the policy in force. Assuming the death benefit stays the same, the more premium the owner pays to keep the policy in force, the lower the return when the death benefit is paid. If the death benefit is not paid, eg the insured lives to maturity, the investor has lost not only the purchase price for the asset but all the premiums paid as well, net of any cash value.

42. All of the aforementioned issues, prevalent in the period from early to late 2000's, made it a necessity for any purchaser of policies that were originated during this timeframe to perform careful legal, regulatory, and origination due diligence on each policy obtained for their portfolio.

### The Emergence of the Older Age Market

43. At the same time STOLI emerged onto the insurance landscape there was a growing interest in marketing to individuals at older ages. This can be seen as a confluence of forces including changes in tax laws, estate planning as the Greatest Generation entered into retirement, and the desire of agents to sell large policies with high commissionable premiums.

44. In the 1980s, insurers and agents focused on traditional areas of coverage from ages 25 – 65. While issue ages generally extended to age 75, agents could request exceptions to 80. Sensing a lucrative market, companies extended issue ages to 85 in the 1990s. Once one company started offering issue ages up to age 85, others were obliged to follow suit or risk losing competitiveness. While some companies went a step further and extended issue ages to age 90, that was the exception, not the rule.

45. The table below shows the average issue maximum age (83.9) and most common maximum issue age (85) for accumulation UL in 2005[2].

Table 7.

| | Average of Max Issue Age | | | Mode (Most Common) Max Issue Age | | |
|---|---|---|---|---|---|---|
| | YE 2005 | YE 2008 | YE 2011 | YE 2005 | YE 2008 | YE 2011 |
| VUL/Variable Life | 85.2 | 84.2 | 84.2 | 85.0 | 85.0 | 85.0 |
| Accumulation UL | 83.9 | 84.5 | 85.8 | 85.0 | 80.0 | 85.0 |
| ULSG | 85.1 | 84.4 | 84.2 | 85.0 | 85.0 | 85.0 |
| Whole Life | 82.8 | 83.8 | 84.2 | 80.0 | 85.0 | 85.0 |
| Term or Term UL | 74.9 | 75.0 | 76.0 | 75.0 | 75.0 | 75.0 |

---

[2] Rozar, Tim et al, "Report on the Survey of Older Age Mortality and Other Assumptions", Society of Actuaries, 2013, p. 10.

46.  There were growing pains as the older age market emerged.  Both health and financial underwriting standards were evolving rapidly.  Savvy agents were able to exploit differences between carriers in order to write large polices with substantial commissionable premium.

## IV.    MISSTATEMENT OF AGE: CONSEQUENCES AND REMEDIES

47.  The case involves the maturity benefit of two $5,000,000 UL life insurance policies issued in 2005 and 2006 to the Mike Magid Irrevocable Trust on the life of Meyer Magid.  The Policies were subsequently assigned to third parties and have changed hands among various life settlement companies over the years.  The current owner and beneficiary of the Policies is Wilmington Trust.

48.  The Policies have the classic characteristics of STOLI transactions: disproportionally large face amounts, sold to an older age insured, and assigned to a third party soon thereafter.  The Policies appear to have been manufactured for the purpose of resale in the life settlement secondary market, but with a significant problem: when originally issuing the policies, Mr. Magid's true age was misstated in the Application.

### Reasons for Reducing Insured Age from 86 to 84

49.  The Applications for the policies represented that the insured was 84 years old at the time of the application, while in reality the insured was 86 years old.  As mentioned previously, the values in an insurance contract are dependent on the true age of the insured: from the premiums, to the cost of insurance charges and cash value, to the amount of insurance coverage the insurer will offer, and ultimately the maturity date of the policy.  Correct information about the insured's true age is the foundation of accurate UL financial calculations, allowing the insurer to appropriately determine and price the risks assumed and calculate and update the policy benefits over the life of the contract.

50.  Although the highest issue age for this American General product was 90[3], as shown above the standard maximum issue age for the industry in 2005 was 85.  Using an attained age of 84 instead of 86 ensured that the Insured's issue age was below the standard industry issue age, allowing his life to be submitted to substantially more insurers for potential coverage.

51.  In addition, this strategy reduces the cost of insurance charges below the appropriate risk which would be charged by the Insurer using the insured's true issue age.  *This results in undercharging mortality risk for the life of the policy.*  For STOLI investors, using a younger issue age has the added benefit of lowering the up front investment costs (premiums and insurance charges are lower for younger issue ages).

52.  Finally, this strategy extended the exposure period for the Owner potentially receiving a death benefit payout, in this case for two years.  This extension becomes particularly important at extreme older ages, as evidenced in this case by the fact that the Insured died in the two year window between the maturity date for his actual birthday vs the maturity date for the birthdate actually used in his application.

---

[3]  AMGEN P003482

53. To summarize, potential reasons for reducing the insured's issue age in the application from 86 to 84 include:

- In order to be below the industry standard maximum issue age of 85, increasing the number of potential opportunities to obtain insurance coverage;

- Reducing the cost of insurance charges, undercharging the mortality risk for the life of the policy;

- Reducing the investment costs for issuing and maintaining the policies;

- Extending the exposure period for receiving a death benefit by two years.

54. In the next section I will determine the financial impact of restating policy values based on the terms of the contract regarding misstatement of age.

***Impact on Maturity Benefits due to a Misstatement of Age***

55. The Policies provide that American General will pay the cash surrender value on the maturity date if the insured is living on that date[4]. As was standard in the life insurance industry at the time, the Policies were intended to mature when the insured attained the age of 100. If the Insured died before reaching 100, American General would pay the death benefit specified in the policies. If the insured outlived the contract by reaching age 100, American General would distribute the Policies' cash surrender value.

56. During the claim process, American General learned that the Insured's true age had been misstated in the applications and in actuality the Insured was over the age of 100 when he died. As a result, American General paid Wilmington Trust the cash surrender value for the Policies and refunded premiums paid for the period beyond maturity, consistent with the terms of the contract at the true age of the insured.

57. Wilmington Trust contends that the Insured's misstatement of age should have no effect on the policy mechanics, despite the fact that the Policies' values were established based on incorrect dates in the application. As stated earlier, the issue age affects all UL policy values.

58. Because of the critical nature of the issue age in the policy mechanics, the Policies allow for the re-determination of benefits if the Insured's age has been misstated. The misstatement of age provision provides as follows:

> "If the age or gender of the Insured has been misstated to Us…We will adjust the excess of the Death Benefit Amount over the Accumulation Value on the date of death to that which would have been purchased by the Monthly Deduction for the policy month of death at the correct cost of insurance rate. By age, We mean age nearest birthday as of the Date of Issue."[5]

---

[4] AMGEN P000001
[5] AMGEN P000015

59. The formula as described makes sense intuitively from the standpoint of correcting the price of risk exposed: adjust the net amount at risk (Death Benefit – Accumulation Value) to reflect the amount that would have been purchased using the adjusted cost of insurance rate. If the true age is lower, the cost of insurance (and mortality risk) is lower. This means the amount of death benefit that can be purchased for the same monthly deduction is increased. If the true age is higher, the cost of insurance (and mortality risk) is higher, meaning the amount of death benefit that can be purchased for the same amount of money is decreased.

60. We can address if the true age is past the maturity date of the policy using these same principles. Reflecting the appropriate cost of insurance (and mortality risk), *the amount of death benefit that can be purchased beyond age 100 is zero*. This can be shown in two different ways, using the policy language, and first principles.

61. Following the policy language, adjust the net amount at risk (Death Benefit – Accumulation Value) to reflect the amount that would have been purchased using the adjusted cost of insurance rate. For attained ages 100 and over, there are no cost of insurance rates for these policies, and it is not possible to purchase any death benefit[6]. From a first principles standpoint, the mortality risk beyond age 100 is zero, because there is no death benefit past age 100.

62. As is standard for UL policies, the Policies provided that they terminate when the insured dies, when the fund value for the policy was insufficient to pay for mortality charges and other expenses, or at the designated maturity date. Because the insured lived beyond age 100, American General paid the cash surrender value on the Policies. This is consistent with the treatment of UL policies in general and these contracts in particular, given the true attained age of the insured.

### *Maturity Extension Riders*

63. In the late 1990's and early 2000's companies began to recognize that the typical design and funding of UL products led to low cash values on maturity. This did not meet the goals or expectations of some customers, who expected that their insurance contract would provide coverage for life.

64. The industry responded to this challenge by developing a variety of Maturity Extension Riders (MERs) which offer policyholders a means to prolong insurance coverage past the established maturity age, for a cost. MERs are structured for the policy owner to prefund the benefit, paying an additional premium for a preset period *before reaching the maturity age*, typically starting at age 90[7]. Once funded, a MER allows for policyholders to continue coverage following the maturity age at the full face amount until the death of the insured.

65. American General offered Maturity Extension Riders as an option at the time the Policies were issued, allowing the policy owner the opportunity to extend the maturity date beyond age 100. The rider language is instructive in this regard: "The death benefit will be equal to the death benefit amount in effect **on the day prior to the original maturity date.**" Without the MER, the benefit on the maturity date is the cash value. By selecting and funding the MER, the death

---

[6] Interrogatory, p. 4.
[7] Cheng, Connie, et al, "With Age Comes Wisdom: Understanding Maturity Extension Riders", Reinsurance News, March, 2018, p. 34".

benefit going forward is the death benefit amount in effect the day before the original maturity date.

66.  In 2008, Coventry First, a prior service provider for the Policies, requested an inforce illustration showing the minimum level premium with a level death benefit taking the policy out to age 110[8]. American General responded that the illustration does not go to 110 as requested because the policy does not have the Maturity Extension Rider, and is therefore only valid through age 100. This was explained to the representative[9].

67.  American General's production demonstrates that Pete Fisher at Life Equity had been provided with an inforce illustration as recently as February 19, 2020 which also showed that no MER had been purchased and a maturity age of 100[10].

68.  Wilmington Trust is a sophisticated STOLI investor, and they are aware of the issue of deaths beyond maturity. The choice is clear: cash surrender value at 100 for no additional cost, or death benefit beyond age 100 for an additional cost. Given the importance of the death benefit to the investors in STOLI policies, it is not clear why a MER was not purchased to ensure payment of the death benefit beyond age 100.

69.  American General issued the policies to mature when the insured attained age 100 because:

  •  This was American General's standard, and the standard in the industry

  •  The 1980 CSO tables which form the guaranteed monthly cost of insurance rates for the polices through age 99, expired at age 100[11]

  •  The insured did not apply for or use the available Maturity Extension Rider.

70.  There is no provision in the Policies to allow for the extension of Maturity beyond age 100 without the purchase of a Maturity Extension Rider, which the investors chose not to do at various opportunities through the life of the policy. This benefit is valuable and costly. Misstating the issue age is not a free pass to obtain the Maturity Extension benefit for free.

### *The importance of satisfying Internal Revenue Code requirements*

71.  The Policies contain a provision reserving the right to modify its terms "as required by the Internal Revenue Code or by way of other applicable law, regulation or interpretation in order to continue treatment of the policy as life insurance[12]".

72.  The IRS promulgates regulations surrounding the standards life insurance products must meet in order to qualify for preferential tax treatment. In general terms, the tax benefits afforded life insurance products include:

---

[8]  AMGEN P000654
[9]  AMGEN P000650
[10]  AMGEN P003266
[11]  AMGEN P000018
[12]  AMGEN P000017

- Tax advantaged death benefits

- Tax deferred cash value accumulation (inside build up)

73. Under section 7702(e)(1)(B), a life insurance contract's deemed maturity date can be no earlier than insured's attained age 95 and no later than the insured's attained age 100. The deemed maturity date is generally the termination date set forth in the contract or the end of the mortality table (attained age 100 in the case of the 1980 CSO mortality table).

74. Although the code does not explicitly preclude an insurer from charging for mortality beyond age 100, the code makes no provisions for how such calculations could be made in terms of benefits to be assumed after age 100[13], which is entirely consistent with 7702(e)(1)(B) cited above. This explains why charges for MER are front loaded in ages 90 to 100. It also places the cost of the benefit squarely in the cohort likely to use the benefit, rather than spreading the cost across all insureds.

### Other Consequences of Misstatement of Age

75. The policies were issued assuming the Insured was age 84 instead of the Insured's true age of 86. As mentioned previously, all calculated UL values depend on the correct issue age. By starting at age 84, the cost of insurance charges are lower than they should have been at the Insured's true age of 86.

76. In fact, for each of the first 14 years the Policies were in force, the Insured was undercharged by two years for their cost of insurance. Because cost of insurance charges were two years below where they should have been, all things being equal, the Policies cash values were higher than they should have been and/or the premium payments were too low. *The misstatement of age remedy in the contract does not address this issue.*

77. By starting at 84 vs 86, the policy had two additional years of exposure to enable death benefits to be paid. This is clearly material, giving the situation we are currently in. Had the Insured's true age (86) been used to issue the Policies, the Policies would simply have matured and the cash value would have been paid.

78. It is important to understand the even though an insured may live past the maturity age and not receive a death benefit, they have none the less received insurance protection for the duration of the policy. This is similar to term insurance, where protection is provided against the financial consequences of death although death benefits may not be paid. However, for investors looking to profit from an insured's demise, there is no satisfaction in obtaining insurance coverage with no death benefit.

### Wilmington Trust

79. Wilmington Trust did not perform adequate diligence when they purchased the policy. It is well known in the industry that any investors purchasing policies that were originated during the STOLI period from mid to late 2000s needed to perform careful legal, regulatory and origination due diligence on each policy obtained for an investment portfolio. Yet somehow the owners of

---

[13] Desrochers, et al. 2004. *Life Insurance & Modified Endowments Under Internal Revenue Code Sections 7702 and 7702A.* Society of Actuaries, Schaumburg Ill., p. 62.

the Policies came into the possession of a fraudulent Florida driver's license, purporting to show a birthdate for the insured in 1921.

80.  The insured's death certificate shows a birthdate in 1919.  The Trust has not provided any evidence to the contrary.  American General's remedy is to restate the Death Benefit Amount to that which would have been purchased by the monthly deduction for the policy month of death at the correct cost of insurance rate, which is zero.

Jim Toole, FSA, CERA, MAAA

**EXHIBIT A**

**JIM TOOLE CURICCULUM VITAE**



# JIM TOOLE, FSA, CERA, MAAA

## EDUCATION

| | |
|---|---|
| Wake Forest University, BS Mathematics *Cum Laude* | **1985 – 1987** |
| Princeton University | **1981 – 1983** |

## CERTIFICATIONS

| | |
|---|---|
| Fellow in the Society of Actuaries | **1997** |
| Chartered Enterprise Risk Analyst | **2009** |
| Member of the American Academy of Actuaries | **1992** |

## EXPERIENCE

**Aurora Actuarial, Winston-Salem, NC**                                   **2022 – present**
*Chief Luminary*
- Litigation support services and expert witness work (defense and plaintiff) for reinsurance, life insurance, and health insurance cases
- Strategic planning, diligence, and transaction support for companies and inforce blocks of business, including assessing the potential cost and impact of reinsurance options
- Comprehensive actuarial services (ratemaking, financial reporting, and risk management) for self-insured plans, captives, and insurers

**FTI Consulting, Inc., Winston-Salem, NC**                                   **2011 – 2022**
*Senior Managing Director*
- Litigation support services and expert witness work (defense and plaintiff) for reinsurance, life insurance, and health insurance cases
- Strategic planning, diligence, and transaction support for companies and inforce blocks of business
- Business plan development and ongoing Appointed Actuary services for the first new life insurance company in North Carolina in over 25 years
- Comprehensive actuarial services (ratemaking, financial reporting, and risk management) for self-insured plans, captives, and insurers

**MBA Actuaries, Inc., Winston-Salem, NC**                                   **2002 – 2011**
*Managing Director, Life & Health*
- Design and filing of individual and group health plan offerings and ongoing financial reporting responsibilities for insurance companies and Multiple Employer Welfare Arrangements (MEWAs)
- Provide comprehensive actuarial services to self-insured plans including budgeting, plan design, and financial reporting
- Long term appointment as chief health actuary for the state of Hawaii responsible for reviewing health rate filings, triennial examinations, and provide research and support for legislative initiatives
- Litigation support services and expert witness work (defense and plaintiff) for life and health insurance cases

**Milliman Latin America, Denver, CO**                                        **1998 – 2002**
*Consulting Actuary*
– Led buy and sell side actuarial teams for M&A transactions in Mexico, Chile, Brazil, Colombia and Argentina, cumulative transactions in excess of $2.5 billion USD
– Reviewed budget methodology and re-engineered processes to minimize the possibility of systemic error and improve consistency with reported GAAP financials
– Demutualization team leader responsible for developing theory and supporting methodology for contribution factor calculations for non-traditional portfolio of UL, VUL and annuity products valued at over $1 billion USD
– Developed and documented practice standards and procedures for communications, proposals, filing and reports

**Tillinghast-Towers Perrin, Mexico City, Mexico**                           **1996 – 1998**
*Consulting Actuary*
– Participated in M&A and bancassurance transactions in Mexico, Chile, Brazil and Argentina, cumulative transactions in excess of $1.0 billion USD
– Developed methodology to use TAS for modeling P&C products
– Spent three months on site developing methodology and assumptions for a block of life and annuity business in the largest Australian demutualization to date

**Penncorp Financial, Raleigh, NC**                                          **1995 – 1996**
*Pricing Actuary*
– Headed product development team for Integon division
– Responsible for contracts, forms, system implementation, and product administration issues
– Responded to inquiries from regulators on product filings
– Provided technical support for inforce illustrations on 10+ UL products

**Odell & Associates, Inc., Winston-Salem, NC**                              **1992 – 1995**
*Consulting Actuary*
– Assisted in the development, filing and implementation of life, health, disability, and critical illness products
– Provided technical support for individual and small group rate increase filings for health products in various states
– Performed life, health, and RBC reserve calculations for statutory statements
– Developed statutory and GAAP life reserve factors and verified their implementation

**MetLife, New York, NY**                                                    **1989 – 1992**
*Actuarial Analyst*
– Responsible for developing assumptions and projecting MetLife's diverse group insurance products for NY Regulation 126 cash flow testing
– Developed programs and processes to perform a mainframe seriatim projection of MetLife's UL portfolio of eighteen product offerings (over 1 million policies)
– Worked extensively with Chalke PTS software to perform traditional and UL model office projections, modifying modules as needed to support Met specific features

**Integon Life Insurance, Winston-Salem, NC**                                **1987 – 1989**
*Actuarial Student*
– Assisted in the development of UL and term life products
– Implemented and tested products on new business and inforce illustration systems
– Performed lapse and mortality experience studies

## PROFESSIONAL ACTIVITIES

| | |
|---|---|
| SOA Individual Life Experience Committee | 2021 – Present |
| AAA Health Equity Working Group | 2020 – 2022 |
| SOA Latin America Committee | 2014 – 2019 |
| SOA Public Health Task Force | 2016 – 2018 |
| SOA Health Curriculum Committee | 2015 – 2018 |
| SOA Vice President | 2014 – 2016 |
| Southeast Actuaries Club Board of Directors | 2012 – 2013 |
| SOA General Insurance Track Syllabus Development Committee | 2012 – 2013 |
| SOA Board of Directors | 2009 – 2012 |
| Self Insurance Institute of America – Health Care Committee | 2008 – 2010 |
| Social Insurance and Public Finance Section Formation | 2008 – 2009 |
| SOA Health Spring Meeting Chair | 2008 – 2009 |
| SOA Health Section Council (Chair 2008) | 2005 – 2008 |
| AAA Extreme Events Working Group | 2005 – 2007 |
| SOA Marketplace Relevance Strategic Action Team | 2004 – 2007 |
| Course 8 Finance Exam Committee (ERM Track) | 2003 – 2006 |
| SOA Strategic Planning Committee | 2000 – 2005 |
| SOA Latin America Committee (founder and chair) | 2000 – 2004 |
| SOA International Policy Committee | 1999 – 2004 |
| Table Manager Update Coordinator | 2001 |
| International Section Council (Chair 2001) | 1998 – 2001 |
| SOA Ambassador Program Coordinator | 1998 – 2000 |
| SOA Ambassador to Mexico | 1997 – 1998 |
| Computer Science Section Newsletter Editor | 1993 – 1994 |
| Computer Science Section Council | 1991 – 1994 |

## PUBLICATIONS

1. *"Five Action Steps to Update your Risk Management Program for a Post Pandemic World,"* FTI Journal, May 2020.
2. *"How COVID-19 will Impact Health Insurance Payers,"* FTI Journal, April 2020.
3. *"Don't Fall Captive to Self-Insurance Risks,"* FTI Journal, March 2018
4. *"Is Your Company Prepared for a Pandemic?,"* FTI Journal, July 2017
5. *"Realistic Steps for Improving your Return on Insurance Data,"* Carrier Management, June 2017
6. *"Re-imagining Employer Healthcare,"* FTI Journal, May 2017
7. Prologue and Epilogue, The ACA@5, Society of Actuaries, August 2015
8. *"Developing a Robust Risk Appetite Statement,"* Carrier Management, April 2015
9. *"ACA and ACOs: Incentivizing Change,"* FTI Consulting, October 2013
10. *"Untapped Opportunities for Actuaries in Health: The Year in Review,"* Society of Actuaries, November 2010
11. *"Accountable Care Organizations: An Untapped Opportunity,"* co-author, *Health Watch*, Society of Actuaries, Issue 64, September 2010
12. *"Potential Impact of Pandemic Influenza on the U.S. Health Insurance Industry,"* Society of Actuaries, June 2010
13. *"Health Company Pandemic Modeling Tool,"* Society of Actuaries June 2010
14. *"Adding Value to Plan Sponsors: Leveraging Your Captive and Self-Insured Plan Experience with ERM," The Self Insurer*, April 2010

15. *"The Economic Measurement of Medical Errors,"* Chair, Research Project Oversight Group, Society of Actuaries, April 2010
16. *"A Catalyst for Change," The Actuary Magazine*, August 2009
17. *"U.S. Health Care System: Righting an Inversion,"* Visions for the Future of the U.S. Health Care System, Society of Actuaries, May 2009
18. *"Pandemic Planning and Recovery," Risk Management*, Society of Actuaries, Issue 14, December 2008
19. *"2008 Year in Review," Health Watch*, Society of Actuaries, Issue No. 59, September 2008
20. *"Potential Impact of a Pandemic on the U.S. Health Insurance System,"* Society of Actuaries, May 2008
21. *"A Healthy Future? Risks and Opportunities Facing the Health Profession," The Actuary*, Society of Actuaries, Vol. 5 No. 2, April/May 2008
22. *"Actuaries Advancing Public Health," Health Watch*, Society of Actuaries, Issue No. 58, May 2008
23. *"Maintaining Professional Relevance in a Rapidly Changing Environment," Health Watch*, Society of Actuaries, Issue No. 57, January 2008
24. *"Potential Impact of Pandemic Influenza on the US Life Insurance Industry,"* Society of Actuaries, May 2007
25. "Life Company Pandemic Modeling Tool," Society of Actuaries, May 2007
26. *"Community Benefit: A Matter of Mission and Accountability,"* co-author, *Health Watch*, Society of Actuaries, Issue No. 55, May 2007
27. *"Navigating New Horizons… An Interview with Eric Stallard," Health Watch*, Society of Actuaries, Issue No. 55, May 2007
28. *"Potential Impact of a Pandemic on the US Life Insurance Industry,"* Life Chief Actuaries Forum, May 2006
29. *"Financial Services Convergence: Big Bang or a Whimper?," The Actuary*, Society of Actuaries, Vol. 2 No. 6, December 2005
30. *"Insurance Industry Mergers and Acquisitions,"* editor and co-author, Society of Actuaries, May 2005

# Jim Toole Expert Testimony Experience in the Past Four Years

| Year | Parties | Description of Dispute: | Venue | Case # |
|------|---------|------------------------|-------|--------|
| 2020 | Citizens, Inc. et al v Randall H. Riley | Valuation of lost business due to actions of former exec and employees | Travis County Texas | D-1-GH-18-006739 |
| 2020 | Large US life insurer vs reinsurer | Reinsurance rate dispute | US Arbitration | |
| 2020 | Asian Insurer vs Investment Consortium | Shareholder valuation dispute | International Chamber of Commerce Court of Arbitration | 24348/HTG |
| 2020 | Asian Insurer vs Investment Consortium | Shareholder valuation dispute | International Chamber of Commerce Court of Arbitration | 24604/PTA |
| 2021 | Large US life insurer vs reinsurer | YRT reinsurance rate dispute | US Arbitration | |
| 2021 | Large US life insurer vs reinsurer | Underwriting standards dispute | US Arbitration | |
| 2021 | Policyholder class vs regional life insurer | UL Sales Practices | United States District Court Cenral District of California | 4:18-cv-03771-YGR |
| 2022 | Large US life insurer vs reinsurer | YRT reinsurance rate dispute | US Arbitration | |
| 2022 | Large US life insurer vs reinsurer | YRT reinsurance rate dispute | US Arbitration | |
| 2022 | Large US life insurer vs reinsurer | YRT reinsurance rate dispute | US Arbitration | |
| 2023 | Large US life insurer vs reinsurer | YRT reinsurance rate dispute | US Arbitration | |
| 2023 | Large US life insurer vs reinsurer | YRT reinsurance rate dispute | US Arbitration | |
| 2023 | Regional SE Asian bank vs large Japanese insurer | Bancassurance compensation dispute | Singapore International Arbitration Center | SIAC Case # ARB 298/21/PLN |
| 2024 | Asian Insurer vs Investment Consortium | Shareholder valuation dispute | International Chamber of Commerce Court of Arbitration | 26899/HTG |
| 2024 | Lifetrade vs Wells Fargo | Life Settlement portfolio valuation disput | US District Court (Southern District New York) | 1:17-cv-02987-JPO-KHP |

**EXHIBIT B**

**MATERIALS CONSIDERED**

# EXHIBIT B

# MATERIALS CONSIDERED

**Produced Documents**

- AMGEN P000001 – AMGEN P003558
- WTNA 0000001 – WTNA0000447

**Briefs**

- First Amended Complaint, May 19, 2023
- Opening Brief, November 17, 2023
- Opposition Brief, December 11, 2023
- Reply Brief, January 5, 2023
- Memorandum Order, June 13, 2024
- Response to Interrogatories, October 31, 2024

**Other Documents**

- Actuarial Standards of Practice (ASOPs)
- American General Life Insurance Company Extension of Maturity Date Rider
- Cheng, Connie, et al, "With Age Comes Wisdom: Understanding Maturity Extension Riders", Reinsurance News, March, 2018.
- Rozar, Tim et al, "Report on the Survey of Older Age Mortality and Other Assumptions", Society of Actuaries, 2013.