# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERICAN GENERAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>WILMINGTON TRUST, NATIONAL ASSOCIATION,<br><br>Defendant. | C.A. No. 1:22-cv-01092-GBW |
| WILMINGTON TRUST, NATIONAL ASSOCIATION,<br><br>Defendant/Counter-Plaintiff,<br><br>v.<br><br>AMERICAN GENERAL LIFE INSURANCE COMPANY,<br><br>Plaintiff/Counter-Defendant. | |

## PLAINTIFF AMERICAN GENERAL LIFE INSURANCE COMPANY'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

[Counsel Listed on Following Page]

*/s/ Sean J. Bellew*
Sean J. Bellew (Bar ID No. 4072)
2961 Centerville Road, Suite 302
Wilmington, DE 19808
T: (302) 353-4951
sjbellew@bellewllc.com

Christopher C. Frost (*pro hac vice*)
Braden T. Morell (*pro hac vice intended*)
MAYNARD NEXSEN P.C.
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
cfrost@maynardnexsen.com
bmorell@maynardnexsen.com

*Attorneys for Plaintiff American General
Life Insurance Company*

## Table of Contents

I.   INTRODUCTION ..................................................................................1

II.  FACTUAL BACKGROUND .......................................................................5

III. LEGAL ARGUMENT ...........................................................................11

   A.   American General Properly Denied Wilmington's Claim Under

   the Misstatement-of-Age Provision. ....................................................11

      1.   The adjustment required by the misstatement-of-age provision

      results in a Death Benefit of zero. ....................................................14

   B.   The Internal Revenue Code Required the Policies to be Modified.

      19

IV.  CONCLUSION.....................................................................................24

CERTIFICATION OF WORD COUNT AND TYPE .............................................25

CERTIFICATE OF SERVICE .........................................................................26

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Aviva Life & Annuity Co. v. Am. Gen. Life Ins. Co.*,

    2014 WL 1677798 (Del. Ch. Apr. 29, 2014) .......................................... 19

*Buck v. Am. Gen. Life Ins. Co.*,

    2021 WL 733809 (D.N.J. Feb. 25, 2021) .............................................. 20

*Calamos Asset Mgmt., Inc. v. Travelers Cas. & Sur. Co. of Am.*,

    2021 WL 663056 (D. Del. Feb. 19, 2021) .............................................. 12

*ConAgra Foods, Inc. v. Lexington Ins. Co.*,

    21 A.3d 62 (Del. 2011) ........................................................... 11

*Ginsberg v. Union Cent. Life Ins. Co.*,

    198 So. 855 (Ala. 1940) ...................................................... 12, 13

*In re CM Holdings, Inc.*,

    254 B.R. 578 (D. Del. 2000) ...................................................... 20

*In re O'Brien*,

    67 B.R. 317 (Bankr. N.D. Iowa 1986) .................................................. 21

*In re Tyler*,

    2004 WL 903826 (Bankr. D.N.H. Apr. 21, 2004) ................................. 20

*Morris James LLP v. Cont'l Cas. Co.*,

    928 F. Supp. 2d 816 (D. Del. 2013)........................................................12

*New York Life Ins. Co. v. Hollender*,

    237 P.2d 510 (Cal. 1951).......................................................................13

*O'Brien v. Progressive N. Ins. Co.*,

    785 A.2d 281 (Del. 2001).......................................................................12

*Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*,

    616 A.2d 1192 (Del. 1992)......................................................................12

*Webber v. Comm'r*,

    144 T.C. 324 (2015)...............................................................................21

## STATUTES

26 U.S.C. § 7702 ................................................................ 4, 20, 21, 22, 23

## RULES

Fed. R. Civ. P. 37 ...................................................................................15

Fed. R. Civ. P. 56...................................................................................15

## OTHER AUTHORITIES

1 Mertens Law of Fed. Income Tax'n § 7:59 ......................................20, 23

6 Couch on Ins. § 86:11 .........................................................................13

## BRIEF IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff American General Life Insurance Company ("American General"), by and through its undersigned counsel, submits this Brief in Opposition to Defendant Wilmington Trust, N.A.'s ("Wilmington")[1] Motion for Partial Summary Judgment, D.E. 74 and 75. The undisputed material facts do not entitle Wilmington to judgment in its favor on its counterclaims. In fact, this Court could recognize that American General is entitled to judgment in its favor on Wilmington's counterclaims and Counts II and III of the First Amended Complaint, D.E. 26.[2]

## I.    INTRODUCTION

Not even sophisticated investors are immune from bad investments. But when an investment goes south, they don't get to rewrite the terms of an agreement to salvage their misguided

---

[1] Wilmington holds the policies at issue as Securities Intermediary for Geronta Funding. D.E. 75 at 4 n.1. Geronta Funding ("Geronta") is an agent of Leadenhall Capital Partners LLP. *See* American General's Response to Defendant's Statement of Undisputed Material Facts ("SUMF") and Statement of Additional Undisputed Material Facts ("AUMF"), ¶38. Because these entities share a common interest with regard to the policies, American General refers to these entities collectively as "Wilmington."

[2] American General's forthcoming motion for summary judgment will further demonstrate that American General is entitled to judgment as a matter of law on each of the claims and counterclaims asserted in this action, including American General's fraud claim, which is not the subject of Wilmington's motion.

expectations. Through this lawsuit, American General asks the Court to enforce the straightforward language of the insurance contracts at issue—which didn't yield the returns Wilmington hoped they would—rather than accepting Wilmington's invitation to rewrite the contracts.

Willington owns the policies for the benefit of an entity that invests billions of dollars in life insurance contracts insuring the lives of scores of individuals. AUMF, ¶41. In purchasing these contracts, Wilmington wagers that these strangers won't outlive their coverage. If these individuals die while their policies are in force, Wilmington collects the death benefit, and the bet pays off. But, in the off chance one of these strangers outlives their policy, the death benefit is no longer payable, and Wilmington strikes out.

That's what happened here. Years after the policies were issued, Wilmington purchased two life insurance policies insuring the life of Meyer Magid. But Wilmington made two incorrect assumptions, altering the calculus of their bet on Mr. Magid's life. First, Wilmington failed to investigate Mr. Magid's actual age when making its investment. Instead, Wilmington assumed Mr. Magid had correctly stated his age, but Wilmington now concedes that was not the case. Mr. Magid was actually

two years *older* than he reported to American General. Second, Wilmington assumed Mr. Magid, who was already in his 90s, wouldn't outlive the contracts—but, again, Wilmington assumed wrong.

Mr. Magid lived to nearly 101 years old, but the policies never provided coverage—or a death benefit—beyond age 100.[3] That conclusion flows from a straightforward application of the policies' language. Indeed, the policies contain a specific misstatement-of-age provision that addresses how to calculate the death benefit in these circumstances: the policies correct the age misstatement by providing the amount of death benefit that would have been available had the age been stated correctly. Specifically, the policies provide the amount of death benefit that the last monthly deduction "would have . . . purchased . . . for the policy month of death at the correct cost of insurance rate." AUMF, ¶18. The policies are clear that the answer is zero for insureds who reach age 100. This is because the cost-of-insurance rates incorporated into the policies provide for death benefits *only* to age 99; there is no rate for age 100, and thus no rate the policies deem "correct." AUMF, ¶33.

---

[3] American General continues to contend that the policies matured when Mr. Magid's true age reached 100. But for the purposes of this Motion only, and without waiving its ability to raise it at a later date, American General does not contest the Court's prior conclusion that the policies' Maturity Dates cannot be altered.

Wilmington, through the testimony of an untimely and undisclosed purported expert, speculates about what the cost-of-insurance rate *could have* been, but the policies leave no room for such hypothesizing. To permit Wilmington to manufacture cost-of-insurance rates and supposed death-benefit amounts where none exist would violate the plain language of the policies misstatement-of-age provision and re-write the contracts Wilmington purchased.

As a separate and independent matter, the policies expressly provide that American General must modify their terms to remain compliant with the Internal Revenue Code. Due to Mr. Magid's age misstatement, that modification was required here. To be considered a "life insurance contract" under Section 7702 of the Internal Revenue Code, the maturity date of a policy must be "no later than the date on which the insured attains age 100." 26 U.S.C. § 7702(e)(1)(B). Not surprisingly, modification pursuant to Section 7702 yields the same result as does application of the misstatement-of-age provision: American General was permitted to modify the maturity date of the policies to Mr. Magid's *true* 100th birthday. Because Mr. Magid was *actually* over the age of 100 when he died, there is no death benefit due and Wilmington is

entitled to a return of the policy's remaining cash value, which American General has long since paid.

American General therefore properly refused Wilmington's claims for the death benefits of the two policies, and the Court should deny Wilmington's motion for summary judgment.

## II.  Factual Background

In November 2005 and February 2006, American General issued two life-insurance policies on the life of Mr. Magid. AUMF, ¶¶1–5. However, Mr. Magid misstated his age when he applied for the Policies: He represented that he was born in August 1921, when in fact he was born in August 1919. AUMF, ¶¶7, 29. As a result of the misstatement, the policies each list an erroneous issue age of 84, rather than Mr. Magid's true age of 86. AUMF, ¶¶8, 30.

The policies are "Flexible Premium Adjustable Life Insurance Policies," meaning Mr. Magid could pay premiums in any amount he chose, as often as he chose. *See* Ex. A to SUMF, at AMGEN P000003. The policies required sufficient premium in order to keep the policies' "Cash Values" high enough to cover the "Monthly Deductions." *Id.* at P000010. If, on the Monthly Deduction Day, the policies' cash values were

insufficient to cover the Monthly Deduction, the policies would lapse, and, if no further premium was paid, they would eventually terminate. *Id.*

The "Monthly Deduction" is, in effect, the amount American General charged each month for insurance coverage. It included the cost of insurance, monthly administrative fee, and a policy expense charge. *Id.* at P000008. The monthly cost of insurance is determined by multiplying the "Net Amount of Risk" by the applicable "cost of insurance rate." *Id.* The Net Amount at Risk is the amount that the death benefit exceeds the policies' accumulated value. *Id.* A cost-of-insurance rate is a multiplier that corrects the Net Amount at Risk to align with the mortality risk assumed by American General, taking into account the insured's age, gender, and health. *Id.* at P000009. The rate increases as a person gets closer to the end of their expected life, and cost of insurance increases. Guaranteed cost-of-insurance rates for the policies are found in a table contained in the policies, and the rates change each year based on the insured's "attained age." *Id.* at P000018; AUMF ¶¶32, 33. These rates are based on the 1980 Commissioners Standard Ordinary Mortality Table. AUMF ¶32.

Each policy provides that it will pay a death benefit "[i]f the Insured dies prior to the Maturity Date and while this policy is in force." *See* Ex. A to SUMF, at AMGEN P000005. The policies' maturity dates were set based on the age at issuance, and each policy was set to mature when Mr. Magid turned 100. AUMF, ¶16. Thus, the maturity dates were specified as November 7, 2021 and February 20, 2022, respectively—dates that represented the first anniversary under each policy after what would have been Mr. Magid's 100th birthday if the erroneous birthdate provided in the application was correct. AUMF, ¶16. If Mr. Magid passed away after these dates, the policies provided for payment of the "Cash Surrender Value" only. AUMF, ¶15. Maturity could be extended through the purchase of a Maturity Extension Rider, which Wilmington declined. Ex. 4 to AUMF (Toole Report) at ¶¶63–70. American General also "reserved" the right to "modif[y]" each policy "if such modification is necessary to make any changes as required by the Internal Revenue Code . . . in order to continue treatment of this policy as life insurance." AUMF, ¶19.

If Mr. Magid passed away while the policies were "in force," the policies would pay the "Death Benefit Amount." *See* Ex. A to SUMF, at

AMGEN P000005. Under both policies, the specified Death Benefit Amount was $5,000,000. AUMF, ¶6. However, the Death Benefit Amount was subject to an adjustment if the insured misstated his age. AUMF, ¶18. Specifically, the policies provide that the Death Benefit Amount would be corrected to what would have been available at the correct age by correcting the Net Amount at Risk to the insured's true age:

> If the: (1) age or gender of the insured . . . has been misstated to Us, We will adjust the excess of the Death Benefit Amount over the Accumulation Value on the date of death to that which would have been purchased by the Monthly Deduction for the policy month of death at the correct cost of insurance rate. By age, We mean age nearest birthday as of the Date of Issue.

*Id.* Stated another way, the misstatement-of-age provision looks to the Monthly Deduction taken at the "month of death," and asks what that deduction would have "purchased" for the insured at the "correct cost of insurance rate" for the insured's true age. As stated previously, a table of guaranteed cost-of-insurance rates is "included in [each] policy." Neither policy provides a cost-of-insurance rate beyond age 99, because neither policy offered a death benefit for purchase for an age beyond 99. *See* AUMF, ¶¶33–34.

In 2015, when Mr. Magid was 96 years old, Geronta purchased the policies from EEA Life Settlements, Inc. for $1.5 million each. AUMF, ¶¶38–39. Wilmington became Geronta's securities intermediary for the policies in 2018. AUMF, ¶¶10, 36–37.

Mr. Magid defied Wilmington's expectations and lived until July 2020—just shy of 101st birthday. AUMF, ¶31. The State of Florida Certification of Death, as well as Mr. Magid's obituary, each listed his birth year as 1919. *See* Ex. G to SUMF at AMGEN P003373–3376. Wilmington nonetheless submitted a claim on August 25, 2020, seeking the full benefits under each policy, and stating that it "reasonably believed" the obituary and death certificate were "incorrect." *Id.* at AMGEN P003371–3372. As support for a 1921 birth year, Wilmington relied on an expired driver's license, a veteran identification card, and a printout from a credit-reporting website. *Id.* Notably, other documents confirmed that Mr. Magid's true birth year was 1919, including medical records and birth records. *See* AUMF, ¶44, Exs. 2, 10, 11, 13. Wilmington did not provide these documents to American General. AUMF ¶44.

Relying on the *only* evidence of Mr. Magid's true age—his death certificate—American General denied the claim in a letter dated April

21, 2021. AUMF, ¶14. American General explained that had Mr. Magid's age been stated correctly, the policies would have matured prior to his death under the misstatement-of-age provision. Ex. H to SUMF at AMGEN P003428–3429. American General therefore paid Wilmington the policies' cash values and refunded premium payments made beyond the policies' correct maturity dates. AUMF ¶¶46–47. In total, American General paid Wilmington over $1.4 million.

Wilmington wrote American General on June 14, 2021, to contest the denial of the claim. AUMF, ¶43, Ex. 9. Without providing additional evidence, Wilmington doubled-down on the argument that Mr. Magid was born in 1921, based solely on the driver's license Wilmington previously provided. Ex. 9 to AUMF at WTNA_0000257–260. Before responding, American General contacted the Florida Highway Safety and Motor Vehicles Department, which provided American General with a copy of Mr. Magid's passport reflecting a 1919 birthdate. AUMF, ¶45; Ex. 1. American General then provided this information to Wilmington on August 5, 2021. AUMF, ¶7, Ex. 1. Undeterred by this clear evidence, Wilmington shifted to the theory it espouses in the present Motion, arguing that it is nevertheless entitled to the full death benefit because

the misstatement-of-age provision compels the calculation of a death benefit for ages beyond the insured's 100th birthday. AUMF, ¶48, Ex. 13.

American General filed this action to obtain a declaration of the parties' rights and obligations under the policies. Wilmington asserted counterclaims for breach of contract under the two policies, D.E. 27, and Wilmington now moves for summary judgment on those counterclaims.

### III.   LEGAL ARGUMENT

#### A. AMERICAN GENERAL PROPERLY DENIED WILMINGTON'S CLAIM UNDER THE MISSTATEMENT-OF-AGE PROVISION.

While the context of this particular case—a misstatement of age that reveals the true age of the insured exceeds the policies' offerings—may be uncommon, the dispute here requires nothing more than a commonplace application of clear and unambiguous contract provisions. An insurance contract is interpreted, just like any other contract, by relying on "traditional principles of contract interpretation." C*onAgra Foods, Inc. v. Lexington Ins. Co.*, 21 A.3d 62, 68 (Del. 2011). "[C]ourts interpret an insurance policy according to the plain meaning of the text." *Calamos Asset Mgmt., Inc. v. Travelers Cas. & Sur. Co. of Am.*, 2021 WL 663056, at *3 (D. Del. Feb. 19, 2021) (quotation omitted). The goal is to "give effect to all provisions therein, and interpret the terms in a common

sense manner." *Morris James LLP v. Cont'l Cas. Co.*, 928 F. Supp. 2d 816, 821 (D. Del. 2013). "[W]here the language of a policy is clear and unequivocal," meaning its "ordinary and usual meaning" resolves the dispute, "the parties are to be bound by its plain meaning." *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) (quotation omitted). Delaware courts are loathe to "destroy or twist policy language under the guise of construing it," because construing the language contrary to its plain meaning, "in effect, create[s] a new contract with rights, liabilities and duties to which the parties ha[ve] not assented." *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195–96 (Del. 1992).

Unambiguous misstatement-of-age provisions like the one at issue here align the parties' contractual expectations to the actual facts. "The age of the insured goes directly to the risk in life insurance," and a misrepresentation as to an insured's age is undoubtedly "material" because it "increase[s] the risk of loss." *Ginsberg v. Union Cent. Life Ins. Co.*, 198 So. 855, 858 (Ala. 1940). Life insurers price their products and determine the amount of premium to charge based on an insured's age. *See id.* But misstatements of an insured's age—whether innocent or

intentional—do happen. Given that reality, misstatement-of-age provisions embody a "manifestly fair" agreement by the parties that a misstatement will not void the policy but, rather the "amount payable under the policy shall be the sum which the premiums paid would have purchased at the correct age." *New York Life Ins. Co. v. Hollender*, 237 P.2d 510, 515 (Cal. 1951); *see* 6 Couch on Ins. § 86:11 (noting that a "misstatement frequently does not avoid the policy but merely reduces the recovery to the amount which would be payable if the correct age had been stated"). Courts recognize that these provisions require adjustment regardless of "[w]hether the benefit redound[s] to the insurer because of an understatement or to the insured because of an overstatement." *Hollender*, 237 P.2d at 515.

Here, the misstatement happens to work against Wilmington. Given the unique facts, the contractual adjustment required is not a mere correction on a sliding scale of contractually available death benefits. The adjustment required here lands squarely in an age range where no death benefit is, or ever was, available for purchase.

### 1.  The adjustment required by the misstatement-of-age provision results in a Death Benefit of zero.

Given Mr. Magid's true age, the death benefit that "would have been purchased" at Mr. Magid's true age on the date of his death yields a death benefit of zero. The misstatement-of-age provision states as follows:

> If the: (1) age or gender of the insured . . . has been misstated to Us, We will adjust the excess of the Death Benefit Amount over the Accumulation Value on the date of death to that which would have been purchased by the Monthly Deduction for the policy month of death at the correct cost of insurance rate. By age, We mean age nearest birthday as of the Date of Issue.

AUMF, ¶18. Performing the contemplated adjustment requires determining each of these inputs—*i.e.*, the "Death Benefit Amount," the "Accumulation Value," the "Monthly Deduction," and "the correct cost of insurance rate."

But each of these inputs leads to no death benefit here. First, and most basically, there is no "correct cost of insurance rate." *See* AUMF, ¶33. The policies could not be clearer about where the parties look for the "cost of insurance rate": each policy provides that the "cost of insurance rates" are specified "in this policy." *See* Ex. A to SUMF at AMGEN P000009. The correct rate is the one that corresponds to the insured's

- 14 -

"attained age," which is the "age nearest birthday as of the Date of Issue." *Id.* at AMGEN P000018. Mr. Magid's true age nearest birthday at the time of death was 100. AUMF, ¶31. Wilmington concedes, as it must, that the policies provide no cost-of-insurance rate for age 100. AUMF ¶25. Thus, there is no "correct cost of insurance rate" to plug into the calculation contemplated by the misstatement-of-age provision.

Wilmington seeks to fill the glaring hole in the misstatement-of-age calculation with speculation. It contends that the "correct cost of insurance rates *can be* extrapolated by various methods," and it offers untimely and undisclosed opinion testimony that purports to "estimate" the applicable cost-of-insurance rate and resulting death benefits.[4] American General has not suggested that a cost-of-insurance rate for age 100 and beyond could not be hypothesized. But that possibility is irrelevant because *the policies* do not provide the tools for—much less allow—extrapolation and estimation. Rather, the policies expressly provide cost-of-insurance rates for each year that coverage is provided

---

[4] Contemporaneous to the filing of this brief, American General is moving to strike the Declaration of Scott Willkomm and Exhibit 1 thereto as a blatant attempt to avoid the expert-disclosure deadline set by the Court. Because the Willkomm Report is inadmissible opinion testimony by an undisclosed expert witness, it is not proper summary judgment evidence. Fed. R. Civ. P. 37(c), 56(c)(2).

under the policies. Nowhere do the policies even contemplate the inclusion of additional cost-of-insurance rates exceeding age 99.

This result is further illustrated by the way the policies price the Maturity Extension Rider, which is the only mechanism in the policies for extending coverage beyond age 100, and which Wilmington chose not to purchase. AUMF, ¶49; Ex. 4 to AUMF (Toole Report) at ¶¶64–70. If purchased, the Maturity Extension Rider would have provided coverage in the same amount provided "on the day prior to the original maturity date." Ex. 14 to AUMF at AMGEN P003495. And, importantly, the Maturity Extension Rider is paid for *prior to* the insured's 100th birthday; once the rider takes effect, the policies provide that "[t]he monthly deduction will be zero." *Id.*; *see also id.* ("There are no Cost of Insurance charges after the original Maturity Date"); *see* Ex. 4 to AUMF (Toole Report) at ¶¶64–65. Thus, the only mechanism in the policies for providing coverage beyond age 100 *acknowledges* that the policies do not provide a mechanism for pricing that coverage.

Similarly, the Monthly Deduction on the date of death—another input of the misstatement-of-age adjustment—is a nullity here because that amount *includes* the "cost of insurance provided by the . . . policy."

- 16 -

*See* AUMF, ¶35. But as established, there is no cost-of-insurance rate to determine the Monthly Deduction at Mr. Magid's true age of 100. And because "the policy months of death" occurred *after* Mr. Magid's 100th birthday, no monthly deduction could "purchase[]" any death benefit amount because the policies' plain terms do not offer any such death benefit for purchase. *See* AUMF, ¶21. The very reason why American General refunded the premium payments Wilmington made in 2019 and 2020 is that—after Mr. Magid's true age was revealed—those payments were "purchas[ing]" nothing.

The same problem infects the next input, the Net Amount at Risk. The policies define Net Amount at Risk in terms of the difference in the Death Benefit Amount and the policies' Accumulation Value. *See* Ex. A to SUMF, AMGEN P000008. But here, on the date of Mr. Magid's death, the policies provided no Death Benefit Amount, and American General has already paid Wilmington the policies' Accumulation Value. *See* AUMF, ¶34. The Net Amount at Risk cannot be "adjust[ed]" from zero. In other words, correcting this age misstatement does not result in a slightly different death benefit amount as may often be the case when the actual revealed age is within the parameters for which coverage can

be purchased—here, the calculation reveals that the misstatement itself is the reason no coverage existed at the time of death.

None of the foregoing is inconsistent with the parties' contractual expectations. To see why, consider what would have happened had Mr. Magid *not* misstated his age. There is no question that under the express terms of the policies, coverage would have terminated in August 2019, nearly a year before Mr. Magid passed away. After that date, it would not have been possible to calculate the monthly cost of insurance because the policies provided no cost-of-insurance rates. Nor would the policies have continued to provide a death benefit. But for Mr. Magid's misstatement, the parties never would have ended up in this dispute. Contrary to the purpose of misstatement-of-age provisions, Wilmington is not asking to correct the parties' expectations—it is asking the Court to use the misstatement-of-age provision to create a new agreement entirely, which would provide coverage beyond what was provided for in the policies.

Wilmington wants this Court to apply the misstatement-of-age provisions in a manner that violates the polices. It wants the Court to enforce the policies as if Wilmington can still purchase the Maturity Extension Rider and pay for it after the fact, but the policies provide

otherwise. *See* Ex. 4 to AUMF (Toole Report) at ¶¶63–70. This Court should refuse to rewrite the policies to salvage Wilmington's investment. Enforcing the policies' express language results in the conclusion that American General, not Wilmington, is entitled to judgment as a matter of law on each of Wilmington's counterclaims and Count II of American General's First Amended Complaint.

### B. THE INTERNAL REVENUE CODE REQUIRED THE POLICIES TO BE MODIFIED.

The policies provide that they will remain consistent with the Internal Revenue Code's definition of "life insurance." *See* Ex. A to SUMF at AMGEN P000017. Insurers and insureds alike expect that life insurance benefits will receive favorable tax treatment. *See* Ex. 4 to AUMF (Toole Report) at ¶¶32–35. Indeed, universal life insurance policies like the ones at issue here "are entitled to significant tax advantages." *Aviva Life & Annuity Co. v. Am. Gen. Life Ins. Co.*, 2014 WL 1677798, at *5 (Del. Ch. Apr. 29, 2014). As a few examples, "[d]eath benefit proceeds are generally not taxable to anyone, . . . the cash build up of earnings [inside a policy] accumulates tax free, loans are considered debt and are not a taxable event[,] and there are no tax penalties associated with withdrawals." *In re Tyler*, 2004 WL 903826, at *2 (Bankr.

D.N.H. Apr. 21, 2004). These policies are designed to permit the owner to accumulate value in the policy—like a bank account—without incurring tax liability. *See Buck v. Am. Gen. Life Ins. Co.*, 2021 WL 733809, at *1 (D.N.J. Feb. 25, 2021).

But the Internal Revenue Code sets limits on the amount these types of policies can accrue by specifying a definition of "life insurance" in 26 U.S.C.A. § 7702; *see* 1 Mertens Law of Fed. Income Tax'n § 7:59. Section 7702 restricts policies in two ways. It "place[s] limits on the amount by which . . . premiums c[an] exceed th[e amount] needed to fund the death benefits" provided by a policy. *In re CM Holdings, Inc.*, 254 B.R. 578, 619 (D. Del. 2000). And, by limiting premiums, Section 7702 "limit[s] . . . the amount of cash value that may accrue within a policy while still qualifying for preferred tax treatment." *Buck*, 2021 WL 733809, at *1. If a policy exceeds Section 7702's limits, it "may lose preferred tax treatment as 'life insurance.'" *Id.*

To preserve the policies' tax benefits, the policies give American General a unilateral right, on notice to Wilmington, to modify the policies' terms "as required by the Internal Revenue Code or by way other applicable law, regulation, or interpretation *in order to continue*

*treatment of th[e] polic[ies] as life insurance.*" AUMF, ¶19 (emphasis added). That modification was required here. To remain "life insurance" under the Internal Revenue Code, the policies must meet certain "tests" under Section 7702. *Webber v. Comm'r*, 144 T.C. 324, 371 (2015). Under these tests, Section 7702(e)(1)(B) "states that the maturity date shall be no earlier than the day on which the insured attains age 95 and no later than the date the insured attains age 100." *In re O'Brien*, 67 B.R. 317, 319 (Bankr. N.D. Iowa 1986). Thus, for the policies to remain "life insurance" under the Internal Revenue Code, it was necessary for American General to modify the policies' maturity dates to be no later than the date Mr. Magid attained age 100. 26 U.S.C. § 7702(e)(1)(B). Otherwise, the policies risk noncompliance with the Internal Revenue Code, and thus risk losing their preferential tax treatment.

Wilmington attempts to avoid the express language of the policies and Section 7702 in two ways. Wilmington first argues that the policies are not *really* required to comply with the Internal Revenue Code because modifications to comply with the Internal Revenue Code benefit the policy owner, not American General. Wilmington effectively argues it can overrule American General's right to modify the policies and choose to

accept a policy with no tax advantages. D.E. 75 at 11–14. But the policies impose no qualification on American General's right to modify the policies—it requires only that the modifications be "necessary to many any changes as required by the Internal Revenue Code . . . to continue treatment of th[e] polic[ies] as life insurance." Ex. A to SUMF at AMGEN P000017.

Wilmington next argues that a modification is not "required" by the Internal Revenue Code for two reasons. First, it argues that Section 7702(e) merely "assumes" a maturity date no later than age 100, leaving open the possibility that a policy could have a maturity date beyond age 100. D.E. 12 (emphasis omitted). That may be true in the abstract, but it doesn't mean the policies here did not have to be modified. Even the authors of Section 7702, through the Joint Congressional Committee General Explanation Wilmington relies on, recognized that this so-called assumption would lead to one of two outcomes: "the deemed maturity date generally is the termination date set forth in the contract *or* the end of the mortality table." 1984 General Explanation, note 80, at 652 (emphasis added). Stated another way, even if Section 7702 merely adjusts the maturity to a "fiction[al]" date between the insured's 95th and

100th birthday, D.E. 75 at 13, the authors of Section 7702 understood that assumption to result in a date *no later than* "the end of the mortality table" applicable to the policy. 1984 General Explanation, note 80, at 652. That conclusion is consistent with other provisions of Section 7702 which provide that "CSO mortality tables generally must be used" to perform calculations under the statute. Mertens, § 7:59 at n.14. Here, the mortality table in the policies, the 1980 CSO table, ended at age 99.

Finally, Wilmington points out that Section 7702 provides that a noncompliant contract "continues to be treated as a valid and enforceable insurance contract." D.E. 75 at 13 (emphasis omitted). But the policies specifically require compliance with the Internal Revenue Code not merely to remain "insurance," but to remain *life* insurance. Ex. A to SUMF at AMGEN P000017.

Because the plain language of the policies and Section 7702 requires a modification to comply with the Internal Revenue Code, American General is entitled to a declaration that the policies' maturity dates could be no later than Mr. Magid's 100th birthday. That conclusion separately results in judgment in American General's favor on Wilmington's breach-of-contract counterclaims.

## IV.    CONCLUSION

For the foregoing reasons, the Court should DENY Wilmington's

motion for summary judgment.

*/s/ Sean J. Bellew*
Sean J. Bellew (Bar ID No. 4072)
2961 Centerville Road, Suite 302
Wilmington, DE 19808
T: (302) 353-4951
sjbellew@bellewllc.com

Christopher C. Frost (*pro hac vice*)
Braden T. Morell (*pro hac vice intended*)
MAYNARD NEXSEN P.C.
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
T: (205) 254-1000
F: (205) 254-1999
cfrost@maynardnexsen.com
bmorell@maynardnexsen.com

*Attorneys for Plaintiff American*
*General Life Insurance Company*

## <u>CERTIFICATION OF WORD COUNT AND TYPE</u>

I hereby certify that the foregoing brief was produced in 14-point font in a similar typeface to Times New Roman. I further certify that, according to the Word count function in Microsoft Word, the foregoing brief contains 4,857 words.


<u>/s/ Sean J. Bellew</u>

- 25 -

## C<small>ERTIFICATE OF</small> S<small>ERVICE</small>

    I certify that this document was served *via* the CM/ECF system to the registered participants identified on the Notice of Electronic Filing on April 25, 2025.

/s/ Sean J. Bellew
